## TEXAS AND PACIFIC RAILWAY COMPANY v. ABILENE COTTON OIL COMPANY.

ERROR TO THE COURT OF CIVIL APPEALS FOR THE SECOND SUPREME JUDICIAL DISTRICT OF THE STATE OF TEXAS.

No. 78.   Argued November 2, 1906.—Decided February 25, 1907.

Where defendant in the state court contends that, consistently with the Interstate Commerce Act, the state court has no power to grant the relief, and such contention is essentially involved and expressly, and, in order to support the judgment, necessarily, decided adversely to the defendant, a Federal question exists and this court can review the judgment on writ of error under § 709, Rev. Stat.

Where the state court determined a case involving railroad rates on the hypothesis conceded by counsel on both sides that the rate was one of a lawful schedule duly filed and published in accordance with the Interstate Commerce Act, the contention that the rate was not so filed and published and, therefore, was not a legal rate is not open in this court.

While repeals by implication are not favored and a statute will not be construed as abrogating an existing common-law remedy, it will be so construed if such preexisting right is so repugnant to it as to deprive it of its efficacy and render its provisions nugatory.

The Interstate Commerce Act was intended to afford an effective and comprehensive means for redressing wrongs resulting from unjust discriminations and undue preference, and to that end placed upon carriers

the duty of publishing schedules of reasonable and uniform rates; and, consistently with the provisions of that law, a shipper cannot maintain an action at common law in a state court for excessive and unreasonable freight rates exacted on interstate shipments where the rates charged were those which had been duly fixed by the carrier according to the act and had not been found to be unreasonable by the Interstate Commerce Commission.

85 S. W. Rep. 1052, reversed.

The facts are stated in the opinion.

Mr. *David D. Duncan,* with whom Mr. *John F. Dillon,* Mr. *Winslow S. Pierce* and Mr. *Thomas J. Freeman* were on the brief, for plaintiff in error:

If an act of Congress gives a right to a party aggrieved without specifying a remedy, it might be enforced in a state court; but, if a right is conferred by statute and a specific remedy provided, or a new power and means of execution granted, the right can be enforced only in the mode provided in the act.

A party who seeks damages alleged to have been sustained in consequence of a violation by a common carrier of the Interstate Commerce Law, as the act provides for redress by a procedure either before the Commission or by suit in a Federal court, cannot bring suit before a state court, which is without jurisdiction to enforce the right, but is relegated exclusively to the Commission or Federal court; otherwise, the party would have a third alternative or mode of redress not contemplated by the act. He is restricted to one of two remedies.

Where a right arises under the laws of the United States, Congress may, if it sees fit, give to the Federal courts exclusive jurisdiction.

When a right is given by statute, and a specific remedy provided, or new power, and also the means of execution, the power can be executed, and the right vindicated, in no other way than that prescribed by the act.

The Interstate Commerce Act providing that remedies thereunder must be sought in the Federal courts or before

the · Interstate Commerce ·Commission, but not in both, by necessary implication, excludes the idea of jurisdiction in ·any other tribunals. The act confers the right and provides the remedy and ·means of enforcement. Interstate Commerce Act, February 4, 1887, and Amendment 1, Supp., Rev. Stat., p. 529, especially §§ 8, 9; *Frank T. Copp v.·L. & N. R. R. Co.*, 43 Louisiana, 511, 514; *G., C. & S. F. v. Moore,* 83 S. W. Rep. 362; *Van Patten v. Chicago, M. & St. P.*, 74 Fed. Rep. 981; *Ex parte McNeil,* 13 Wall. 236; *Gilman v. Philadelphia,* 3·Wall. 713; *Swift v. Philadelphia R. R. Co.*, 58 Fed. Rep. 858; *Claflin v. Houseman,* 93 U. S. 130 (see p. 137); *The Moses Taylor,* 4 Wall. 411, 425, 431; Story on the Const., §§ 436–447.

. The only lawful rate that can be charged and collected by a common· carrier upon an interstate shipment is the legally filed, published and posted rate under the act to regulate commerce, and ·no cause of action for damages or otherwise will lie against a carrier for collecting its duly-published, filed and posted rates. If this rate be unreasonable, the only remedies the shipper has are those provided in § 9 of the Interstate Commerce Act. By the terms of that act, it is illegal for either a corporation or person to give or receive any rebate, concession, etc., and declaring same to be unlawful, and the person or corporation so doing to be guilty of a misdemeanor. By §§ 6, 10 of the original act, and by the Elkins amendment of February 19, 1903, it is provided that it shall be a misdemeanor and unlawful, punishable by a fine, for any person, persons or corporations to grant, give or solicit, accept or receive, any rebate or concession in respect to the transportation· of· property in interstate or foreign commerce, whereby, any such property shall, by any device whatever, be· transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereof. *Texas & Pacific Ry. Co. v. Mugg & Dryden,* 202 U. S. 242; *Hefley v. Railway Co.,* 158 U. S. 98; *Southern Ry. v. Harrison,* 119 Alabama, 539; *M., K. & T. Ry. Co. v. Trinity Lumber Co.,* 1 Tex. Civ. App.

553; *Texas & Pacific Ry. Co. v. Clark*, 4 Tex. Civ. App. 611; *M., K. & T. Ry. Co. v. Stoner*, 5 Tex. Civ. App. 50; *Dillingham v. Fischel*, 1 Tex. Civ. App. 546; *S. A. & A. P. Ry. Co. v. Clements*, 20 Tex. Civ. App. 498; Act of Congress of February 4, 1887, 1 Supp. U. S. Stats. 529, and amendments thereto, especially §§ 6, 10.

*Mr. Hannis Taylor* for defendant in error:

The highest court of a State may administer the common law according to its own understanding and interpretation, without liability to a review in the Federal Supreme Court, unless some right, title, immunity or privilege, the creation of the Federal power, has been asserted or denied. *Penna. R. R. Co. v. Hughes*, 191 U. S. 477, and cases there cited.

This common law right, as thus administered, was not taken away by the Interstate Commerce Act (approved February 4, 1887) either directly or by necessary implication. Statutes in derogation of the common law are to be strictly construed and are not presumed to make any alteration in the common law further or otherwise than the clear import of the statutory language necessarily requires. 26 Am. & Eng. Ency. of Law, (2d ed.) 662, and authorities cited, including *Brown v. Barry*, 3 Dall. 365; *Wilson v. Lenox*, 1 Cranch, 211; *McCool v. Smith*, 1 Black, 459; *Shaw v. Railroad Co.*, 101 U. S. 557. Affirmative words without negative words do not annul the common law. Unless the intent of a statute is manifest, the constructive repeal of the common law, by implication, cannot be inferred. *Jennings v. Commonwealth*, 17 Pick. 82; *State v. Norton*, 23 N. J. L. 39. When a statute merely provides a new remedy for a preëxisting right, the new remedy is merely cumulative. 26 Am. & Eng. Ency. of Law, (2d ed. 614, 671, and cases cited.

The interpretation clause of the Interstate Commerce Act specially provides that "nothing in this act shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition

to such remedies." A statutory declaration contained in the body of an act, declaring the meaning thereof as well as the intent of the legislature in enacting it, is mandatory and controlling on the courts. *Farmers Bank* v. *Hale*, 59 N. Y. 53; *Commonwealth* v. *Curry*, 4 Pa. Super. Ct. 356; *Snyder* v. *Compton*, 87 Texas, 374; *Rossmiller* v. *State*, 114 Wisconsin, 169.

No right, title, privilege or immunity under a Federal statute specially pleaded and set up in the state court was denied by that court. *Kizer* v. *Texarkana & Ft. Smith Ry. Co.*, 179 U. S. 199. Even if the state court could not try questions involving the construction of the Interstate Commerce Act, yet this suit being brought on the common law liability of plaintiff in error, jurisdiction to hear and determine the facts pleaded by defendant in error could not be defeated by facts outside of the allegations unless a plea had been interposed to the jurisdiction; such plea showing want of jurisdiction in the trial court, and further showing a court with jurisdiction.

Mr. Justice White delivered the opinion of the court.

The oil company, the defendant in error, sued to recover $1,951.83. It was alleged that on shipments of carloads of cotton seed made in September and October, 1901, over the line of the defendant's road from various points in Louisiana east of Alexandria, in that State, to Abilene, Texas, the carrier had exacted, over the protest of the oil company, on the delivery of the cotton seed, the payment of an unjust and unreasonable rate, which exceeded in the aggregate, by the sum sued for, a just and reasonable charge. There were, moreover, averments that the rate exacted was discriminatory, constituted an undue preference, and amounted to charging more for a shorter than for a longer haul. Besides a general traverse, the railway company defended on the ground that the shipments were interstate, and were, therefore, covered by the act of Congress to regulate commerce. It was averred that as the rate complained of was the one fixed in the rate

sheets which the company had established, filed, published and posted, as required by that act, the state court was without jurisdiction to entertain the cause, and even if such court had jurisdiction, it could not, without disregarding the act to regulate commerce, grant relief upon the basis that the established rate was unreasonable, when it had not been found to be so by the Interstate Commerce Commission.

The trial court made findings of fact. Those relating to the subject of the establishing, filing and publishing by the railway company of rate sheets containing the rate which was complained of were as follows:

"7th. That the Western Classification Committee, agent and representative of numerous railways and of defendant, filed with the Interstate Commerce Commission what is known as the Western Classification, giving classifications of different articles or items of merchandise, and in same cotton seed is classed as 'A;' that this was the joint act of a number of roads, and the defendant adopted said joint classification; that on May 30, 1901, the Southwestern Freight Committee, agent of a number of roads and agent of defendant, filed with the said commission a supplement for numerous roads in connection with defendant, whereby the rate on cotton seed from all points in Louisiana east of Alexandria was fixed at 67 cents per 100 pounds to all points in Texas from all points in Louisiana east of Alexandria and west of Alexandria.

"8th. That said classification and said rate schedule was adopted by defendant and was filed by said S. W. Freight Committee with said Interstate Commerce Commission in behalf of defendant.

"9th. That copies of said schedule and said tariffs and classifications were kept in the office of said defendant at said points of shipment and at said Abilene, that is, in the freight office and depots, for the inspection of the public, as admitted by plaintiff, which admission is found in the statement of facts.

"10th. That other than said schedule and classification nothing has been filed with the Interstate Commerce Com-

mission by or in behalf of defendant in the way of classifications, schedules or rates on cotton seed from points on its road in Louisiana to points on its road in Texas."

From the facts found the court stated the following as its conclusions:

"1st. The facts so found show that this was an interstate shipment.

"2d. The facts so found show that the defendant complied with the interstate commerce law, and said rates and classifications were thereby properly established and in force, except that the rate charged on cotton seed in carload lots was unreasonable and excessive.

"3d. I find that the rate charged by the defendant was that established under the interstate commerce law."

As nothing in these conclusions relates to the averments of discrimination, undue preference, or a greater charge for a shorter than for a longer haul, those subjects, it may be assumed, were considered to have been eliminated in the course of the trial.

There was judgment for the railway company. When the controversy came to be disposed of by the Court of Civil Appeals, to which the cause was taken, that court deemed there was only one question presented for decision; that is, whether, consistently with the act to regulate commerce, there was power in the court to grant relief upon the finding that the rate charged for an interstate shipment was unreasonable, although such rate was the one fixed by the duly published and filed rate sheet, and when the rate had not been found to be unreasonable by the Interstate Commerce Commission. In opening its opinion the court said (85 S. W. Rep. 1052):

"Adopting the construction of the pleadings evidently given them in the briefs, and treating it as presented, the case, briefly stated, is an action by appellant for damages for a violation of an alleged common law right, in that appellee demanded and coercively collected from appellant freight charges in excess of a reasonable compensation, for the trans-

portation of a number of carloads of cotton seed from the town of Cotton Port and other designated towns in the State of Louisiana to the city of Abilene in the State of Texas."

After referring to the findings as to the unreasonableness of the charge exacted, and after pointing out that the railway company had not, by a cross assignment, challenged the correctness of the findings of the trial court as to the unreasonableness of the rate, it was said:

"So that we are relieved from a consideration of the difficulties discussed in some of the cases in ascertaining the fact, and therefore now have squarely before us the questions whether in a state court a shipper in cases of interstate carriage can, by the principles of the common law, be accorded relief from unjust and unreasonable freight rates exacted from him, or shall relief in such cases be denied merely because such unreasonable rate has been filed and promulgated by the carrier under the Interstate Commerce Act?"

Proceeding in an elaborate opinion to dispose of the question thus stated to be the only one for consideration, the conclusion was reached that jurisdiction to grant relief existed, and that to do so was not repugnant to the act to regulate commerce. Applying these conclusions to the findings of fact, the relief prayed was allowed. The court said:

"We therefore adopt the trial court's findings of fact, and, applying thereto the principles of law we have deduced, reverse the judgment, and here render judgment in appellant's favor for the said sum of $1,951.83, excessive freights charged, with interest. . . .".

The assigned errors are addressed exclusively to the operation of the act to regulate commerce upon the jurisdiction of the court below to entertain the controversy, and its power in any event to afford relief to the oil company, based upon the alleged unreasonableness of the rate under the circumstances disclosed. Before we take up the consideration of that subject, however, two questions must be disposed of: First, it is insisted that this court is without jurisdiction, because no

Federal question is presented.   We think it suffices to say that it obviously results from the statements previously made that a question of that character was presented by the pleadings, was passed upon by the trial court, was expressly and necessarily decided by the court below and is also essentially involved in the cause as it is before us.   Second, it is urged that the effect of the act to regulate commerce upon the right of the oil company to recover need not be passed upon, since, even if error on that subject was committed below, a review of the decision in that regard is unnecessary, because if the correct legal inference be drawn from the facts found by the trial court, which were adopted by the appellate court, it will result that the railway company had not established a legal schedule of rates in compliance with the act to regulate commerce, and therefore the jurisdiction of the court and its right to afford relief was not at all affected by the provisions of the act.   We do not presently stop to consider whether the consequences as to jurisdiction and right to recover which are asserted would result if the premise was well founded, because we think the premise is either shown by the findings to be unfounded or it is not open for contention on the record.   The premise rests upon two propositions of fact:   a. That the findings of the trial court show that the rate sheet filed was joint and therefore did not necessarily relate to a shipment entirely over the road of the railway company.   This contention, we think, is shown by the findings to be without merit, since those findings clearly point out that the rate sheet was filed by an agent of the defendant railroad, was by it adopted, and constituted the only rate sheet embracing the traffic in question.   b. Although it is conceded that the evidence showed that the schedule of rates was established and filed with the Interstate Commerce Commission and was kept at the stations of the railway company for public inspection, and that the oil company had knowledge of the fact, it is insisted that the facts found do not justify the conclusion that there was a compliance with the requirements of the act to regulate com-

merce as to the posting of the established schedule. We think this contention is not open on this record. As we have seen, the trial court expressly concluded that the railway company had complied with the act to regulate commerce in the matter of filing, etc., its schedule of rates, and the appellate court opened its opinion by the statement that the course of the trial and the briefs of counsel confined the issue for determination to the question of the effect of the act to regulate commerce upon the rights of the parties, manifestly upon the assumption that the correctness of the conclusion of the trial court as to compliance with the act was conceded by both parties. In other words, as the court below in deciding the case expressly declared that the course of the argument and briefs of counsel before it had confined the case to the issue of whether there was a right to recover upon the hypothesis that a schedule of rates had been filed and published, we do not think that it is now open to contend that that which the court below in effect declared was conceded in the briefs of counsel to be a lawful schedule of rates was not such. *Non constat,* that if the Court of Civil Appeals, having the evidence before it, had not treated the case as presented, it might not have considered the facts in relation to the publication of the schedule and affirmatively found facts inevitably compelling the conclusion that the act to regulate commerce had been fully complied with, even if such inference was not sufficiently sustained by the findings of the trial court which the appellate court adopted. Because we thus find the question not open for consideration we must not be considered as conceding the correctness of the conclusion attempted to be drawn from the supposed failure to post.

We are thus brought to the underlying proposition in the case, viz., the effect of the act to regulate commerce upon the claim asserted by the oil company. As presented below and pressed at bar, the question takes a seemingly two-fold aspect, the jurisdiction of the court below as affected by the act to regulate commerce and the right to the relief sought consist-

ently with that act, even if jurisdiction existed. We say that these questions are only seemingly different, because they present but different phases of the fundamental question, which is the scope and effect of the act to regulate commerce, upon the right of a shipper to maintain an action at law against a common carrier to recover damages because of the exaction of an alleged unreasonable rate, although the rate collected and complained of was the rate stated in the schedule filed with the Interstate Commerce Commission and published according to the requirements of the act to regulate commerce, and which it was the duty of the carrier under the law to enforce as against shippers. We come, therefore, first, to the consideration of that subject.

Without going into detail, it may not be doubted that at common law, where a carrier refused to receive goods offered for carriage except upon the payment of an unreasonable sum, the shipper had a right of action in damages. It is also beyond controversy that when a carrier accepted goods without payment of the cost of carriage or an agreement as to the price to be paid, and made an unreasonable exaction as a condition of the delivery of the goods, an action could be maintained to recover the excess over a reasonable charge. And it may further be conceded that it is now settled that even where, on the receipt of goods by a carrier, an exorbitant charge is stated, and the same is coercively exacted either in advance or at the completion of the service, an action may be maintained to recover the overcharge. 2 Kent. Comm., 599, and note a; 2 Smith Lead. Cas., pt. 1, 8th ed., Hare & Wallace notes, p. 457.

As the right to recover, which the court below sustained, was clearly within the principles just stated, and as it is conceded that the act to regulate commerce did not in so many words abrogate such right, it follows that the contention that the right was taken away by the act to regulate commerce rests upon the proposition that such result was accomplished by implication. In testing the correctness of this proposition we

concede that we must be guided by the principle that repeals by implication are not favored, and indeed that a statute will not be construed as taking away a common law right existing at the date of its enactment, unless that result is imperatively required; that is to say, unless it be found that the preëxisting right is so repugnant to the statute that the survival of such right would in effect deprive the subsequent statute of its efficacy; in other words, render its provisions nugatory.

Both parties concede that the question for decision has not been directly passed upon by this court, and that its determination is only persuasively influenced by adjudications of other courts. They both hence mainly rely upon the text of the act to regulate commerce as it existed at the time the shipments in question were made. The case, therefore, must rest upon an interpretation of the text of the act and is measurably one of first impression.

Let us, without going into detail, give an outline of the general scope of that act with the object of fixing the rights which it was intended to conserve or create, the wrongs which it proposed to redress and the remedies which the act established to accomplish the purposes which the lawmakers had in view.

The act made it the duty of carriers subject to its provisions to charge only just and reasonable rates. To that end the duty was imposed of establishing and publishing schedules of such rates. It forbade all unjust preferences and discriminations, made it unlawful to depart from the rates in the established schedules until the same were changed as authorized by the act, and such departure was made an offense punishable by fine or imprisonment, or both, and the prohibitions of the act and the punishments which it imposed were directed not only against carriers but against shippers, or any person who, directly or indirectly, by any machination or device in any manner whatsoever, accomplished the result of producing the wrongful discriminations or preferences which the act forbade. It was made the duty of carriers subject to the act

.to file with the Interstate Commerce Commission created by that act copies of established schedules, and power was conferred upon that body to provide as to the form of the schedules, and penalties were imposed for not establishing and filing the required schedules. The Commission was endowed with plenary administrative power to supervise the conduct of carriers, to investigate their affairs, their accounts and their methods of dealing, and generally to enforce the provisions of the act. To that end it was made the duty of the District Attorneys of the United States, under the direction of the Attorney General, to prosecute proceedings commenced by the Commission to enforce compliance with the act. The act specially provided that whenever any common carrier subject to its provisions "shall do, cause to be done, or permit to be done any act, matter or thing in this act prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this act required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this act. . . ." Power was conferred upon the Commission to hear complaints, concerning violations of the act, to investigate the same, and, if the complaints were well founded, to direct not only the making of reparation to the injured persons, but to order the carrier to desist from such violation in the future. In the event of the failure of a carrier to obey the order of the Commission that body, or the party in whose favor an award of reparation was made, was empowered to compel compliance by invoking the authority of the courts of the United States in the manner pointed out in the statute, *prima facie* effect in such courts being given to the findings of fact made by the Commission. By the ninth section of the act it was provided as follows:

"That any person or persons claiming to be damaged by any common carrier subject to the provisions of this act may either make complaint to the Commission, as hereinafter provided for, or may bring suit in his or their own behalf for the recovery

of the damages for which such common carrier may be liable under the provisions of this act, in any District or Circuit Court of the United States of competent jurisdiction; but such person or persons shall not have the right to pursue both of said remedies, and must in each case elect which one of the two methods of procedure herein provided for he or they will adopt. . . ."

And by section 22, which we shall hereafter fully consider, existing appropriate common law and statutory remedies were saved.

When the act to regulate commerce was enacted there was contrariety of opinion whether, when a rate charged by a carrier was in and of itself reasonable, the person from whom such a charge was exacted had at common law an action against the 'carrier because of damage asserted to have been suffered by a discrimination against such person or a preference given by the carrier to another. *Parsons* v. *Chicago & Northwestern Ry.,* 167 U. S. 447, 455; *Interstate Commerce Commission* v. *Baltimore & Ohio R. R.,* 145 U. S. 263, 275. That the act to regulate commerce was intended to afford an effective means for redressing the wrongs resulting from unjust discrimination and undue preference is undoubted. Indeed, it is not open to controversy that to provide for these subjects was among the principal purposes of the act. *Interstate Commerce Commission* v. *Cincinnati, New Orleans & Texas Pacific Ry. Co.,* 167 U. S. 479, 494. And it is apparent that the means by which these great purposes were to be accomplished was the placing upon all carriers the positive duty to establish schedules of reasonable rates which should have a uniform application to all and which should not be departed from so long as the established schedule remained unaltered in the manner provided by law. *Cincinnati, New Orleans & Texas Pacific Ry. Co.* v. *Interstate Commerce Commission,* 162 U. S. 184; *Interstate Commerce Commission* v. *Cincinnati, New Orleans & Texas Pacific Ry. Co.,* 167 U. S. 479.

When the general scope of the act is enlightened by the

considerations just stated it becomes manifest that there is not only a relation, but an indissoluble unity between the provision for the establishment and maintenance of rates until corrected in accordance with the statute and the prohibitions against preferences and discrimination. This follows, because unless the requirement of a uniform standard of rates be complied with it would result that violations of the statute as to preferences and discrimination would inevitably follow. This is clearly so, for if it be that the standard of rates fixed in the mode provided by the statute could be treated on the complaint of a shipper by a court and jury as unreasonable, without reference to prior action by the Commission, finding the established rate to be unreasonable and ordering the carrier to desist in the future from violating the act, it would come to pass that a shipper might obtain relief upon the basis that the established rate was unreasonable, in the opinion of a court and jury, and thus such shipper would receive a preference or discrimination not enjoyed by those against whom the schedule of rates was continued to be enforced. This can only be met by the suggestion that the judgment of a court, when based upon a complaint made by a shipper without previous action by the Commission, would give rise to a change of the schedule rate and thus cause the new rate resulting from the action of the court to be applicable in future as to all. This suggestion, however, is manifestly without merit, and only serves to illustrate the absolute destruction of the act and the remedial provisions which it created which would arise from a recognition of the right asserted. For if, without previous action by the Commission, power might be exerted by courts and juries generally to determine the reasonableness of an established rate, it would follow that unless all courts reached an identical conclusion a uniform standard of rates in the future would be impossible, as the standard would fluctuate and vary, dependent upon the divergent conclusions reached as to reasonableness by the various courts called upon to consider the subject as an original question. Indeed the recognition of such a right is

wholly inconsistent with the administrative power conferred upon the Commission and with the duty, which the statute casts upon that body, of seeing to it that the statutory requirement as to uniformity and equality of rates is observed. Equally obvious is it that the existence of such a power in the courts, independent of prior action by the Commission, would lead to favoritism, to the enforcement of one rate in one jurisdiction and a different one in another, would destroy the prohibitions against preferences and discrimination, and afford, moreover, a ready means by which, through collusive proceedings, the wrongs which the statute was intended to remedy could be successfully inflicted. Indeed no reason can be perceived for the enactment of the provision endowing the administrative tribunal, which the act created, with power, on due proof, not only to award reparation to a particular shipper, but to command the carrier to desist from violation of the act in the future, thus compelling the alteration of the old or the filing of a new schedule, conformably to the action of the Commission, if the power was left in courts to grant relief on complaint of any shipper, upon the theory that the established rate could be disregarded and be treated as unreasonable, without reference to previous action by the Commission in the premises. This must be, because, if the power existed in both courts and the Commission to originally hear complaints on this subject, there might be a divergence between the action of the Commission and the decision of a court. In other words, the established schedule might be found reasonable by the Commission in the first instance and unreasonable by a court acting originally, and thus a conflict would arise which would render the enforcement of the act impossible.

Nor is there merit in the contention that section 9 of the act compels to the conclusion that it was the purpose of Congress to confer power upon courts primarily to relieve from the duty of enforcing the established rate by finding that the same as to a particular person or corporation was so unreasonable as to justify an award of damages. True it is that

the general terms of the section when taken alone might sanction such a conclusion, but when the provision of that section is read in connection with the context of the act and in the light of the considerations which we have enumerated we think the broad construction contended for is not admissible. And this becomes particularly cogent when it is observed that the power of the courts to award damages to those claiming to have been injured, as provided in the section, contemplates only a decree in favor of the individual complainant, redressing the particular wrong asserted to have been done, and does not embrace the power to direct the carrier to abstain in the future from similar violations of the act; in other words, to command a correction of the established schedules, which power, as we have shown, is conferred by the act upon the Commission in express terms. In other words, we think that it inevitably follows from the context of the act that the independent right of an individual originally to maintain actions in courts to obtain pecuniary redress for violations of the act conferred by the ninth section must be confined to redress of such wrongs as can, consistently with the context of the act, be redressed by courts without previous action by the Commission, and, therefore, does not imply the power in a court to primarily hear complaints concerning wrongs of the character of the one here complained of. Although an established schedule of rates may have been altered by a carrier voluntarily or as the result of the enforcement of an order of the Commission to desist from violating the law, rendered in accordance with the provisions of the statute, it may not be doubted that the power of the Commission would nevertheless extend to hearing legal complaints of and awarding reparation to individuals for wrongs unlawfully suffered from the application of the unreasonable schedule during the period when such schedule was in force.

And the conclusion to which we are thus constrained by an original consideration of the text of the statute finds direct support, first, in adjudged cases in lower Federal courts and

in the construction which the act has apparently received from the beginning in practical execution; and, second, is persuasively supported by decisions of this court, which, whilst not dealing directly with the question here presented, yet necessarily concern the same.

1. In *Swift* v. *Philadelphia &c. Ry. Co.*, 64 Fed. Rep. 59, it was held that in an action at law to recover damages for the exaction of an alleged unreasonable freight charge, the rate established in conformity with the act to regulate commerce must be treated by the courts as binding upon the shipper, until regularly corrected in the mode provided by the statute. And in *Kinnavey* v. *Terminal R. R. Association*, 81 Fed. Rep. 802, in an able opinion, the question was carefully considered and the same doctrine was announced and applied. When it is considered that the act to regulate commerce was enacted in 1887, and that neither the diligence of counsel nor our own researches have brought into view any case except the one now under consideration, holding that a court could, compatibly with the terms of that act, grant relief upon the basis that the established rate could be disregarded as unreasonable, it would seem to follow that the terms of the act had generally been treated in practical execution as incompatible with the existence of such power or right.

And this is greatly fortified when it is borne in mind that the reports of the decisions of the Interstate Commerce Commission show that many cases have been passed upon by that body concerning the unreasonableness of a rate fixed in an established schedule, which have resulted in awarding reparation to shippers and to the making of orders directing carriers to desist from future violation of the act; that is to say, in necessary legal effect correcting established schedules.

2. The cases of *Cincinnati, New Orleans & Texas Pacific Ry. Co.* v. *Interstate Commerce Commission*, 162 U. S. 184; *Louisville & Nashville R. R. Co.* v. *Behlmer*, 175 U. S. 648, and *Interstate Commerce Commission* v. *Louisville & Nashville R. R. Co.*, 190 U. S. 273, involved the enforcement against carriers

of orders of the Commission.  After deciding that the orders of the Commission were not entitled to be enforced, because of errors of law committed by that body, this court declined to consider the question of the reasonableness *per se* of the rates as an original question; in other words, the correction of the established schedule without previous consideration of the subject by the Commission.  It was pointed out that by the effect of the act to regulate commerce it was peculiarly within the province of the Commission to primarily consider and pass upon a controversy concerning the unreasonableness *per se* of the rates fixed in an established schedule.  It was, therefore, declared to be the duty of the courts, where the Commission had not considered such a disputed question, to remand the case to the Commission to enable it to perform that duty, a conclusion wholly incompatible with the conception that courts, in independent proceedings, were empowered by the act to regulate commerce, equally with the Commission, primarily to determine the reasonableness of rates in force through an established schedule.

In *Gulf, Colorado &c. Ry.* v. *Hefley,* 158 U. S. 98, the facts were these: A rate had been fixed by a carrier in a bill of lading for an interstate shipment, which rate was less than that established under the provisions of the act to regulate commerce.  On arrival of the goods at destination the carrier refused to deliver on tender of payment of the bill of lading rate, and demanded payment of and collected the higher established schedule rate.  For so doing the carrier was proceeded against under a statute of the State of Texas, imposing a penalty upon a carrier for charging more than the rate fixed in a bill of lading.  A judgment of the state court, enforcing the penalty, was reversed, upon the ground that the state statute, as applied, was repugnant to the act to regulate commerce, the court saying (p. 102):

"The carrier cannot obey one statute without sometimes exposing itself to the penalties prescribed by the other.  Take the case before us.  If, in disregard of the joint tariff estab-

lished by the defendant and the St. Louis and San Francisco Railway Company and filed with the Interstate Commerce Commission, the latter company, as a matter of favoritism, had issued this bill of lading at a rate less than the tariff rate, both the defendant company and its agent would, by delivering the goods upon the receipt of only such reduced rate, subject themselves to the penalties of the national law, while, on the other hand, if the tariff rate was insisted upon, then the corporation would become liable for the damages named in the state act. In case of such a conflict the state law must yield."

In *Texas & Pacific Ry. Co.* v. *Mugg,* 202 U. S. 242, the facts were as follows: On an interstate shipment a given rate, less than the lawful schedule rate, was quoted to the shipper by the agent of the railroad at the point of shipment. On the arrival of the goods at their destination the road exacted the schedule rate, whilst the shipper insisted he was entitled to the lower and quoted rate. And a recovery of the excess collected over the quoted rate was allowed by a court of the State of Texas. Reversing the judgment, it was here held that the rate fixed in the schedule filed pursuant to the act to regulate commerce was controlling, that it was beyond the power of the carrier to depart from such rates in favor of any shipper, and that the erroneous quotation of rates made by the agent of the railroad did not justify recovery, since to do so would be in effect enabling the shipper, whose duty it was to ascertain the published rate, to secure a preference over other shippers, contrary to the act to regulate commerce.

In view of the binding effect of the established rates upon both the carrier and the shipper, as expounded in the two decisions of this court just referred to, the contention now made if adopted would necessitate the holding that a cause of action in favor of a shipper arose from the failure of the carrier to make an agreement, when, if the agreement had been made, both the carrier and the shipper would have been guilty of a criminal offense and the agreement would have been so absolutely void as to be impossible of enforcement. Nor is

there force in the suggestion that a like dilemma arises from
the recognition of power in the Commission to award repara-
tion in favor of an individual because of a finding by that body
that a rate in an established schedule was unreasonable. As
we have shown, there is a wide distinction between the two
cases. When the Commission is called upon on the complaint
of an individual to consider the reasonableness of an established
rate, its power is invoked not merely to authorize a departure
from such rate in favor of the complaint alone, but to exert
the authority conferred upon it by the act, if the complaint is
found to be just, to compel the establishment of a new schedule
of rates applicable to all. And like reasoning would be applica-
ble to the granting of reparation to an individual after the
establishment of a new schedule because of a wrong endured
during the period when the unreasonable schedule was en-
forced by the carrier and before its change and the establish-
ment of a new one. In other words, the difference between
the two is that which on the one hand would arise from de-
stroying the uniformity of rates which it was the object of the
statute to secure and on the other from enforcing that equality
which the statute commands.

(But it is insisted that, however cogent may be the views
previously stated, they should not control, because of the fol-
lowing provision contained in section 22 of the act to regulate
commerce, viz.: "   .   .   .   Nothing in this act contained shall
in any way abridge or alter the remedies now existing at com-
mon law or by statute, but the provisions of this act are in
addition to such remedies." This clause, however, cannot in
reason be construed as continuing in shippers a common law
right, the continued existence of which would be absolutely
inconsistent with the provisions of the act. In other words,
the act cannot be held to destroy itself. The clause is con-
cerned alone with rights recognized in or duties imposed by
the act, and the manifest purpose of the provision in question
was to make plain the intention that any specific remedy given
by the act should be regarded as cumulative, when other ap-

propriate common law or statutory remedies existed for the redress of the particular grievance or wrong dealt with in the act.

The proposition that if the statute be construed as depriving courts generally, at the instance of shippers, of the power to grant redress upon the basis that an established rate was unreasonable without previous action by the Commission great harm will result, is only an argument of inconvenience which assails the wisdom of the legislation or its efficiency and affords no justification for so interpreting the statute as to destroy it. Even, however, if in any case we were at liberty to depart from the obvious and necessary intent of a statute upon considerations of expediency, we are admonished that the suggestions of expediency here advanced are not shown on this record to be justified. As we have seen, although the act to regulate commerce has been in force for many years, it appears that by judicial exposition and in practical execution it has been interpreted and applied in accordance with the construction which we give it. That the result of such long-continued, uniform construction has not been considered as harmful to the public interests is persuasively demonstrated by the fact that the amendments which have been made to the act have not only not tended to repudiate such construction, but, on the contrary, have had the direct effect of strengthening and making, if possible, more imperative, the provisions of the act requiring the establishment of rates and the adhesion by both carriers and shippers to the rates as established until set aside in pursuance to the provisions of the act. Thus, by section 1 of the act approved February 19, 1903, commonly known as the Elkins act, which, although enacted since the shipments in question, is yet illustrative, the willful failure upon the part of any carrier to file and publish " the tariffs or rates and charges," as required by the act to regulate commerce and the acts amendatory thereof, " or strictly to observe such tariffs until changed according to law," was made a misdemeanor, and it was also made a misdemeanor to offer, grant,

give, solicit, accept or receive any rebate from published rates or other concession or discrimination. And in the closing sentence of section 1 it was provided as follows:

"Whenever any carrier files with the Interstate Commerce Commission or publishes a particular rate under the provisions of the act to regulate commerce or acts amendatory thereof, or participates in any rates so filed or published, that rate as against such carrier, its officers, or agents in any prosecution begun under this act, shall be conclusively deemed to be the legal rate, and any departure from such rate or any offer to depart therefrom shall be deemed to be an offense under this section of this act."

And, by section 3, power was conferred upon the Interstate Commerce Commission to invoke the equitable powers of a Circuit Court of the United States to enforce an observance of the published tariffs.

Concluding, as we do, that a shipper seeking reparation predicated upon the unreasonableness of the established rate must, under the act to regulate commerce, primarily invoke redress through the Interstate Commerce Commission, which body alone is vested with power originally to entertain proceedings for the alteration of an established schedule, because the rates fixed therein are unreasonable, it is unnecessary for us to consider whether the court below would have had jurisdiction to afford relief if the right asserted had not been repugnant to the provisions of the act to regulate commerce. It follows, from what we have said, that the court below erred in the construction which it gave to the act to regulate commerce.

*The judgment below is, therefore, reversed, and the case remanded for further proceedings not inconsistent with this opinion.*